AMERICAN V.I.P. LIMOUSINES, INC., Campanile Motor Service, Inc., d/b/a Club Limousine Service, Aragon Motors, Inc., d/b/a Cars of the Rich & Famous Limousine Service, Limousines of South Florida, Inc., and Red Top Sedan Service, Inc., Plaintiffs,

v.

DADE COUNTY BOARD OF COUNTY COMMISSIONERS, acting as the Dade County Aviation Authority, Defendant.

No. 89–1909–Civ.

United States District Court,
S.D. Florida.

Feb. 13, 1991.

Richard B. Austin, Miami, Fla., for plaintiffs.

Thomas P. Abbott, Asst. Co. Atty., Aviation Div., Miami, Fla., for defendant.

## MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW

ARONOVITZ, District Judge.

THIS ACTION was tried to the Court non-jury on October 29, October 30 and October 31, 1990, and having considered the testimony and evidence adduced, the many exhibits offered and received in evidence, the arguments of counsel, each respectively, and all memoranda of law submitted by the parties, and being otherwise fully advised in the premises, the Court herewith enters this Memorandum Opinion which includes Findings of Fact and Conclusions of Law as indicated.

### Nature of the Action:[1]

Plaintiffs, for-hire limousine companies providing prearranged passenger service at the Miami International Airport (MIA), have brought this action against the defendant, acting through the Dade County Aviation Department (DCAD), seeking a declaratory judgment that defendant's ordinances, regulations, and practices, including its operational directives and the assessment of charge thereunder regulating plaintiffs' services to and in connection with their passengers picked up at MIA, constitute an undue burden on interstate commerce and are in violation of the Equal Protection Amendment. Plaintiffs seek injunctive relief from the impermissible effect of the ordinances, regulations, and practices, including discriminatory service charges.

### Basis of Federal Jurisdiction[1]

This Court's jurisdiction over this matter is founded on the Court's Federal Question Jurisdiction, (28 U.S.C. § 1331), as the matter arises under the Constitution and Laws of the United States of America; to wit: The Commerce Clause of the U.S. Constitution, Article 1, Sec. 8, Clause 3, and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Furthermore, plaintiffs seek relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* and Rule 57 of the Federal Rules of Civil Procedure. The injunctive relief sought is based on 28 U.S.C. §§ 1651 and 2202 and Rule 65, *Fed.R. Civ.P.*

---

1. Following herewith under this heading are stipulated facts as they appear in the Bilateral Pretrial Stipulation.

A) Plaintiffs, American V.I.P. Limousines, Inc., Campanile Motor Service, Inc., d/b/a Club Limousine Service, Aragon Motors, Inc., d/b/a Cars of the Rich & Famous Limousine Service, Limousines of South Florida, Inc., and Red Top Sedan Service, Inc., are all Florida corporations operating as for-hire prearranged limousine transportation companies at MIA.

B) Defendant is Metropolitan Dade County, a political subdivision of the State of Florida, which owns and operates the Miami International Airport through its Aviation Department.

C) Pursuant to § 125.012, Florida Statutes, § 1.01 of the Metropolitan Dade County Home Rule Charter, the County duly adopted Chapter 25, entitled "Aviation Department Rules and Regulations", including §§ 25–3, 25–4, and 25–1.2 thereof.

D) County also adopted Operational Directive 24 ("OD 24"), and 42 ("OD 42"). OD 24 applies to commercial ground transportation services provided to passengers and users of Miami International Airport. Part of OD *24* applies to limousines operating to and from the airport and provides for vehicle regulatory controls and fees applicable to such limousine operations. OD *42* applies to taxi operations.

E) Like most international airports in major cities, Miami International Airport is divided into three areas: the Airside, the Terminal, and the Landside. The disputes in this case involve the Landside, the area involving vehicle services and facilities for passengers in the roadway areas that provide access to the terminal building. The area specifically involved in this matter is the Lower Vehicular Drive ("LVD"). That is the area where passengers after deplaning their flights and claiming their baggage meet their ground transportation after leaving the terminal building. The DCAD has rules which govern the use of the lower vehicular drive by the various forms of ground transportation that use the facilities. Plaintiffs' challenge involve the rules governing for-hire vehicles including taxicabs and limousines as set forth in OD 24 and OD 42.

F) DCAD, through OD 24 and 42, imposes the complained of rules upon limousines and taxis.

G) For purposes of use, MIA car rental companies are divided into two sub categories. They are: "on-airport" rental companies which rent counter space in the Terminal Building for the rental of cars located in the baggage claim area of MIA, and "off-airport" rental companies which maintain no facilities at MIA and pay no rent to DCAD.

H) Dade County has provided for a $10.00 charge under its 1977 resolution based on a correct cost/benefit analysis established by *Evansville—Vanderburgh Airport Authority District v. Delta Air Lines*, 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972), and its progeny. Plaintiffs expressly claim, however, that the $10.00 charge is discriminatorily applied to plaintiffs vis-a-vis taxis, and its validity is to be determined under the interstate commerce clause and Equal Protection laws of the 14th Amendment.

I) Plaintiff operators are engaged in interstate commerce. That each plaintiff has filed an application to be granted the right to operate as an interstate limousine company at MIA in accordance with applicable operational directives and has on file, in accordance with the rules, the required insurance certificates, $2,500.00 cash bond and makes application for D–5 permits and pays a fee of $10.00 for each such permit and that such status and conditions have been in effect since adoption of OD 24 in 1977. (These were the charges applied at the time this litigation was instituted.)

## FINDINGS OF FACT

1. Like most larger international airports in major cities, MIA is divided into three areas: Airside, Terminal, and Landside. The disputes in this case involve Landside; i.e.: the area involving vehicle services and facilities for passengers in the roadway areas that provide access to the terminal building. The area specifically involved in this cause is known as the Lower Vehicular Drive. That is the area where passengers, after deplaning their flights

and claiming their baggage, meet their ground transportation for the purpose of leaving MIA for their intended ultimate destination. The DCAD has rules which govern the use of the Lower Vehicular Drive by the various forms of ground transportation that use the Land facilities. Plaintiffs' challenge involves the different rules and user charges governing for-hire vehicles, specifically taxis and limousines as delineated in OD 24 and OD 42 and DCAD practices in implementing these directives.

2. The lower vehicular drive is a one way street located under the upper drive. It curves in a "U" shape following the eastern face of the MIA passenger terminal building. It is entered at the northeastern end of the terminal and the traffic flow is first westerly curving south and then exiting from under the upper drive in an easterly direction at the southeastern corner of the terminal. Except at the beginning at the northeastern part of the terminal where there are 8 lanes divided by 2 passenger safety islands, the lower vehicular drive is 6 lanes wide divided roughly in half by a string of passenger safety islands. The 3 lanes closest to the terminal and the baggage area are referred to as the "commercial lanes" and the 3 lanes outside of or east of the passenger islands is called the "public lanes". Under DCAD regulations and practices, certain types of vehicles are allowed to use the commercial lanes and others are restricted to the public lanes. Large buses cannot use the lower vehicular drive because of the low ceiling.

3. OD 24 sets forth regulations covering operations at and fees for operations at MIA and the lower vehicular drive by several types of transportation services. By custom or the terms of OD 24 they include in whole or in part limousines and buses operating in interstate commerce, certain car rental company buses and some miscellaneous categories not pertinent to this proceeding.

For purposes of using the MIA lower vehicular drive area, car rental companies are divided into two categories. They are: "on-airport" car rental companies which rent counter space in the Terminal adjacent to the baggage area of MIA; and "off-airport" car rental companies which maintain no facilities at MIA and pay no rent to DCAD. On-airport company buses use the commercial lanes. Off-airport companies are required to use the public lane, but pay no fee.

Buses under OD 24 are charged a fee of either $10 or $20 for each pick up. The breaking point is based on passenger capacity. Buses of less than 38 passenger capacity pay the $10 user fee. A bus is defined by the Florida Legislature for traffic control purposes as any motor vehicle with a capacity of 10 passengers or more § 316.003(3), *Florida Statutes*, 1989.

Plaintiffs' limousines, which are defined as for-hire vehicles, are charged under the less than 38 passenger bus rate of $10 per pick up. For-hire vehicles are defined under the Dade County Code as having a passenger capacity of 8 or less excluding the driver §§ 31–81(i) and (*l*). See also § 323.01(9), *Florida Statutes*, 1979 (Repealed under Florida's Sunset Act, 1980). Dade County ordinances treat taxis and limos alike for regulatory purposes §§ 31–81(g). Limousines are required to use the public lanes. Taxis are not.

The Dade County Commission, under a 1977 resolution, set this fee based on a correct cost/benefit analysis established by *Evansville—Vanderburgh Airport Authority District v. Delta Air Lines*, 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972), and its progeny. At that time, plaintiffs were prohibited from providing service at MIA. See *Charter Limousine v. Dade County*, 678 F.2d 586 (5th Cir., Unit B, 1982).

4. Plaintiffs' limousines before picking up their passengers must go to an airport office located in the parking area near the center of the "U" of the lower vehicular drive and make a written application for and receive a special permit form called a D–5. This is issued by DCAD for that specific vehicle and pick up. It is not transferable. The D–5 must be displayed in a prominent place in the limo at all times

it is in the airport. It is only valid for the one specified pick up.

In the event of extreme congestion in the public lanes or large amounts of luggage to be loaded or other causes which make it impractical or impossible to either get the passengers and their baggage to the passenger island to wait while the driver goes to get the limousine and bring it to the parking lane on the outside of the passenger island, the driver must take the passengers and their baggage into the public parking garage for loading.

5. Taxis are regulated under OD 42. They are also for-hire vehicles and differ from limousines primarily in that they charge by meter (§ 25–1[37], § 31–81[*l*]) and mark their vehicles with a distinct color scheme and logo (§ 31–85[a]). Limousines are unmarked (49 CFR § 1058.5[b]) and their charges at MIA are by the hour or by a previously agreed fixed fee for a point-to-point movement.

6. Plaintiffs' activities involve prearranged transportation. Reservations and payment arrangements are made through nationwide networks, travel agencies, corporate travel departments, and direct reservation and payment arrangements made by individual passengers before the passenger's journey commences. The passengers involved in using limos are overwhelmingly coming from points outside of Florida. The service provided by plaintiffs at MIA is interstate in nature. *Charter Limousine v. Dade County, supra,* 589; *Southerland v. St. Croix Taxicab Association,* 315 F.2d 364 (3d Cir.1963).

7. Plaintiffs' counterpart service at MIA, taxicabs, are engaged in intrastate transportation service. *U.S. v. Yellow Cab,* 332 U.S. 218, 233, 67 S.Ct. 1560, 1568, 91 L.Ed. 2010 (1947); *Evanston Cab Co. v. Chicago,* 325 F.2d 907, 909 (7th Cir.1963); *Airport Taxi Cab Advisory Committee v. Atlanta,* 584 F.Supp. 961, 964 (USDC, ND GA 1984). Plaintiffs have proven, and defendant does not contest, that their operations and passengers at MIA are participating in and are part of the interstate stream while taxis are engaged in and transport intrastate passengers.

8. The gravamen of plaintiffs' complaint is that limousines and taxicabs are similarly situated in their use of MIA, and yet they are treated differently by County, pursuant to its policies. As shown at trial, the following regulations and conditions apply to the limousines, but not to taxicabs:

a. Each time a limousine arrives at the airport to pick up a passenger, the limousine driver must check-in at a drive-in booth operated by the County's Aviation Department and obtain a permit for that trip in the form of a "D–5" document. Taxicabs, on the other hand, drive into a holding area dedicated for their use and do not have to separately obtain a D–5 permit; rather, taxicabs drive into a holding area dedicated for their use and wait there until they are metered out of the holding area into the pick up lanes of the upper or lower drive.

b. Limousines are not permitted to use the same pick-up lanes provided by the Aviation Department for taxicabs on the lower level of the airport. Taxicabs and other "demand" transportation service providers are permitted to use the "commercial service lanes" located immediately next to the Terminal Building and sidewalk on the lower drive of the airport where passengers exit the building after picking up their baggage. Limousines, on the other hand, are required to use the outer lanes or "public lanes" which are used by "non-demand" transportation services and the general public.

c. Plaintiffs complain of delays that are not encountered by taxicabs in this process. Due to the nature of the limousine business, in which the driver meets passengers inside the Terminal Building, the driver must first park his limousine. Drivers help the passengers claim their bags and bring them to a curbside area where the driver then leaves to get the limousine. The driver must then drive back to the passengers and bags at the curbside where he left them. The drivers claim that not having the same access to the same lanes as taxicabs exacerbates the delays and inconveniences encountered in this process.

d. At the time this action was instituted, the County required a limousine to pay the sum of $10 each time it arrived at the airport to pick up a passenger, whereas a taxicab paid $1 each time it arrived at MIA to pick up a passenger. Additionally, each plaintiff is required to post a $2,500 minimum security deposit with the airport.

9. Plaintiffs claim they are in interstate commerce because they engage in "the packages or pre-arranged transportation of passengers arriving at or departing from MIA." (Complaint, Paragraph 6.) Plaintiffs' vehicles consist solely of luxury limousine classified either as "stretch limousines" or "sedans" made by Cadillac or Lincoln motor car companies. Plaintiffs further allege that "... as to equipment, volume and nature of the service to be provided, [Plaintiffs' vehicles] are identical" to taxicabs. (Complaint, Paragraph 12.)

10. Plaintiffs distinguish their allegedly interstate service from the allegedly intrastate taxicab services by claiming that the only difference between the services provided by either ·is that plaintiffs' passengers:

"... are accepted for transportation by reservation only on a pre-arranged basis and such movements are therefore interstate in character while taxicabs solicit and accept passengers at MIA on a random, non-reserved basis and such airport passenger are therefore intrastate in character." (Complaint, Paragraph 12)

11. County owns the Miami International Airport and operates it through the County's Aviation Department ("DCAD"). As a Home Rule County under Florida law (Article VIII, Section 6(e), Florida Constitution), the County adopted a home rule charter which provides in Section 1.01 that:

The Board of County Commissioners shall be the legislative and the governing body of the County and shall have ... the power to:

\* \* \* \* \* \*

(2) Provide and operate air, water, rail and bus terminals, port facilities, and public transportation systems.

12. In 1973, the County adopted Ordinance No. 73–8 which provides that:

An Aviation Department is hereby established, which shall be responsible for the administration of all projects of the Board of County Commissioners which have been or will be established pursuant to Chapter 71–249, Law of Florida....

(Section 2–278, Code or Metropolitan Dade County)

13. *Florida Statute* 125.012 gives Dade County's Board of County Commissioners various powers in relation to a "project", which is defined in Section 125.011(2) to include an "airport", and specifically states that such board shall have the power:

(9) To fix, regulate, and collect rates and charges for the services and facilities furnished by any project under its control; to establish, limit, and control the use of any project as may be deemed necessary to ensure the proper operation of the project; to impose sanctions to promote and enforce compliances....

\* \* \* \* \* \*

(18) To adopt and promulgate suitable rules, regulations, and directions for the operation and conduct of any project owned or operated by the county and for the use of any such project and any facility connected therewith by others.

Pursuant to this authority, the Board of County Commissioners enacted Chapter 25, Code of Metropolitan Dade County, Florida, entitled, "Aviation Department Rules and Regulations". Section 25–3 provides that:

(a) No person, unless duly authorized in writing by the department and unless payment of any fees or charges as may be established from time to time for such activity shall be made by such person, and unless such person fully complies with any applicable operational directive, shall, in or upon any area of the airport:

(1) Engage in any business or commercial activity;

(2) Sell, or offer for sale, any merchandise or service;

(3) Solicit any business or trade, including the transportation of person or baggage for hire. . . .

And, Section 25–4 provides in part that:

(b) [N]o person shall utilize a vehicle for any commercial activity on the airport, or transport persons, baggage, or goods or any combination thereof from Miami International Airport without a valid permit issued by the department if the department has issued an operational directive requiring such a permit.

Section 25–1.2 deals with "operational directives" and states that:

(c) The Aviation Department, through its director or his authorized designee, may from time to time, cause to be issued operational directives applicable to any airport. If any operational directive contains a requirement that fees or charges be paid for any operation on or use of the airport as defined in such operational directive, the board shall separately establish such fees and charges.

14. The County introduced testimony relating to the serious vehicle traffic control problems at the airport and how such vehicle capacity constraints required the regulatory provisions of OD 24 complained of by the plaintiffs.

Airports like Miami International Airport are generally divided into three operational areas: the "airside", where airplanes land, taxi, and take-off; the "terminal", where passengers congregate to embark or disembark the aircraft; and the "landside", which includes the areas in front of and surrounding the former two areas where vehicles are given access to the airport primarily in order to drop off or pick up passengers, provide governmental and emergency services, and make deliveries to users and tenants of the airport.

15. The present Terminal facility at Miami International Airport was designed in the 1950s to handle approximately 6 million passengers per year. It was placed into operation in 1959 and at the present time handles more than 24 million passengers annually. The landside roadway system is essentially the same today as it was in 1959.

16. F.A. Elder, Aviation Director of the airport, testified that landside vehicle traffic continues to be one of the major problems at the airport. All major international airports in the United States, including MIA, have serious passenger capacity restraints caused not by the airports' inability to accommodate arriving and departing aircraft, but by the airports' inability to handle the ground transportation vehicles bringing the passengers to and from the airports' terminals.

17. The roadway system at the airport consists of an upper drive for departing passengers (hereafter the Upper Vehicular Drive or the "UVD") and the lower drive for arriving passengers (hereafter the Lower Vehicular Drive or the "LVD"). As testified to by Mr. Elder, the LVD is where the worst vehicle congestion occurs. The LVD is split into two driving areas, the first consisting of the inner "commercial service lanes" and the second consisting of what are known as the outer "public lanes". The Commercial service lanes consist of three lanes located immediately adjacent to the sidewalk of the Terminal Building; however, traffic moves only through the middle lane, the first and third lanes being used for vehicles stopping to pick up passengers. The first or innermost lane is used for taxicabs and shuttle vans to queue themselves in order to pick up passengers. The third or outermost lane is used for on-airport rental company courtesy vans to pick up passengers, staging of the Airport Regional Taxicabs, parking stands for medical and fire and other emergency vehicles, and parking stands for certain federal, state, local and Aviation Department vehicles. As just noted, only the center lane accommodates moving traffic in the commercial service lanes.

18. The public lanes likewise consist of three lanes, but two of its three lanes are used by moving vehicles. The innermost lane (located in the curbside of the median island separating the public lanes from the commercial service lanes), is for private vehicles which may stop there, but only for so long as it takes to pick up waiting passengers and their baggage. The public

lanes are used by limousines, private automobiles, and the other commercial ground transportation vehicles not assigned to the commercial service lanes or the more distant bus loop lanes. The greatest number of vehicles using the public lanes are private automobiles.

19. In order to accommodate the number of vehicles making use of the LVD, the Aviation Department had to consider the various types of vehicles desiring to use MIA. These vehicles include:

—Private automobiles and vehicles
—Delivery Trucks
—Courtesy Vehicles
——On airport car rental companies
——Off airport car rental companies
——Hotel, motel and parking lot operators
—Couriers
—Taxicabs
—Employee shuttle buses
—Crew pick up vans
—Passenger shuttle vans provided under contract with DCAD (Supershuttle)
—Large passenger buses
——Seaport
——Tour operators
—Small passenger buses
—Commercial tour vans
—DCAD vehicles
—Police, fire, and medical emergency vehicles
—Federal, state and local governmental vehicles
—Construction contractor vehicles
—Limousines

20. The Aviation Department provided testimony of an expert traffic Engineer, Mr. Eugene Bechamps, whose company made a traffic count of all vehicles of whatever type using the UVD and LVD. According to his testimony, on Friday, August 31, 1990, 42,347 vehicles used the airport's landside roadway facilities during the 17–hour period from 9:00 AM to 2:00 AM the next morning. This number included 23,462 vehicles on the UVD and 18,885 vehicles on the LVD. Of the 18,885 vehicles on the LVD, 3,896 used the commercial service lanes, 13,180 used the public lanes,

and 1,809 used the bus loop area. He also related the traffic count made on Sunday, September 2, 1990, which showed that 33,663 vehicles used the landside roadways during the same 17–hour period. As to the vehicle counts on both days, Mr. Bechamps testified that the road counts were statistically representative of the road counts on any typical day during the 365–day year.

21. Mr. Elder testified that the growth in vehicle usage at the airport is caused by a number of factors:

(a) One factor is the natural consequence of more people travelling by air.

(b) Another factor is MIA's high "origin-destination" ration of 70%. This means that 70% of the passengers using the airport either originate their flight or terminate their flight in Miami. This percentage of passengers, therefore, will necessarily arrive at or leave the Terminal Building in some form of ground transportation. A "hub" airport, on the other hand, will have a low ratio, meaning that the bulk of passengers using the airport have not originated or terminated at the airport but rather are on their way through the airport to catch a connecting flight. These passengers have no need to leave the Terminal Building to use ground transportation services.

(c) A third factor is the increased travel to Dade County's Seaport. Travel to and from the Miami area through the airport has enjoyed considerable growth as a result of an increase in the number of passengers destined for the cruise ships at the County's Seaport, which is now the largest passenger seaport in the world.

22. Traffic flow patterns at the airport are not steady in nature but rather vary with peaks and troughs during the day and evening period. Peaks occur when the greatest number of aircraft arrive at the airport, and usually occur daily from 11:00 AM to about Noon, then from about 4:00 PM to 6:00 PM, and finally from about 9:00 PM to 11:00 PM.

23. The vehicle traffic counts taken by Mr. Bechamps show clearly that limousines, like the other forms of ground trans-

portation, use the airport most frequently during these peak periods. This observation is supported by the nature of the limousine business, in that limousines are used typically by businessmen who travel to and from Miami, and who therefore take the same flights that bring them here at the peak times during the day when aircraft serving other passengers arrive and depart.

24. Defendant introduced into evidence videotapes of traffic movements in the LVD during typical peak periods at the traffic movements in the LVD during typical peak periods at the airport. These illustrated the nature of the significant vehicle congestion in the LVD and UVD. Mr. Elder testified as to the impact of such congestion in general at the airport: first, traffic flow is seriously hampered; second, the presence of increased vehicles presents safety hazards for the passengers and pedestrians; and third, potential dangers to the environment and health of all users of the LVD are increased due to increased vehicle exhaust and emissions.

25. Defendant demonstrated the environmental and health dangers with evidence showing the difficulty of effectively removing vehicle emissions from the LVD. Because the LVD is horseshoe in structure (resembling the letter C with the open end toward the east), and because the prevailing breezes in South Florida are from the southeast, the breezes push exhaust and emissions up against the terminal front where they then tend to collect. In 1988, the County engaged in a $2.4 million project to install 77 vertical fans around this horseshoe-shaped area so that some of the vehicle emissions would be exhausted from the LVD area. Notwithstanding this fan system, the Aviation Department remains justifiably concerned about the level of exhaust and emissions in the LVD, and must continually monitor the carbon monoxide levels. Mr. Elder testified that the fan exhaust system and natural air movement can handle exhaust and emissions from traffic moving efficiently through the LVD, but may not be able to handle it if vehicles are stalled by traffic congestion.

26. Because of the need to maximize efficient use of the LVD, the Aviation Department determined that there was a need to classify the various types of vehicles for the purposes of their use of MIA landside facilities. To this end it was essential for the County to decide which types of vehicles should use the commercial service lanes and which the public lanes for maximum efficiency and to best serve the public. Well before the issuance of OD 24 in 1980, the County had determined that the ends of efficiency and public convenience would best be served by assigning "demand" vehicles to the commercial service lanes and all other vehicles to the public lanes or the bus loop area. This assignment existed for ten years before any complaint was voiced by any of the plaintiffs.

27. As Mr. Elder testified, the primary function of all airports is to serve the travelling public arriving at and departing from the airport. A critical component of this service is making certain that a full range of ground transportation services are available to passengers 24 hours a day, 365 days a year. Passengers must be able to arrive at the airport at any time of day or night and be able to "demand" ground transportation, whether it be a taxicab, bus, shuttle van service, or rental car.

28. Because the County separately regulates taxicabs under Chapter 31 of the Dade County Code, the Aviation Department has provided for demand taxicab service under a separate operational directive. That directive is known as OD 42, which is not here in issue but which serves to regulate taxicab traffic at the airport.

29. The "demand" shuttle van service is provided by a single company, Supershuttle, under an exclusive franchise contract with the airport. As testified to by Mr. Elder, one of the plaintiffs in this action, Red Top Sedan, provided such service from the mid 1940s to 1989, at which time it was outbid for the service by Supershuttle. Under this contract, Supershuttle has the exclusive right to provide shuttle van/bus service from the airport, in exchange for which the company agrees to provide van service 24 hours per day, 365 days per

year, and pay the airport a percentage of its gross receipts.

30. Demand rental car service is provided by six "on-airport" rental car companies. These presently include Hertz, Avis, National, Budget, Value and Dollar. Each of these companies has bid publicly for the right to provide such service. Each is provided counter space near the bag pick up stations throughout the lower level of the Terminal Building for which the companies pay the Aviation Department a monthly rental. Each company also pays the Aviation Department a minimum monthly or a percentage of its gross revenues if such percentage exceeds such minimum monthly amount. The airport derives approximately $12 million per year from such percentage-of-gross charges to these on-airport rental car companies.

31. More importantly, each of the six on-airport rental car companies agrees to provide its courtesy vehicles and rental cars "on demand". A passenger can obtain a rental car from any of these companies 24 hours a day, 365 days per year.

32. Conversely, several ground transportation service companies provide service on terms established by the companies and not on a contractually-required or regulated industry basis which would compel such companies to provide service whenever a passenger arrives at the airport and demands the service. Plaintiffs' limousines provide this type of non-demand service, as do hotels, motels, and off-airport parking lot operators, all of whom offer their services as they schedule them and not as the passenger or customer demands them.

33. The County's evidence shows the extensive demand service provided to passengers at MIA. According to the vehicle count taken by Mr. Bechamps during the 17–hour period, 1667 taxicabs, 251 shuttle vans, 1882 on-airport rental car company courtesy vans, and 96 other vehicles used the commercial lanes, for a total of 3,896 vehicles. But, during peak periods, the total number of vehicles in the commercial service lanes reaches 345 vehicles per hour. During seven of these peak hours, Mr. Bechamps testified that the number exceeds 300 vehicles per hour. Critically important was his testimony that the maximum number of vehicles that should be accommodated in the commercial service lanes is 250 vehicles per hour. If use of the commercial service lanes were limited to 250 vehicles per hour, traffic would move efficiently and quickly through the commercial service lanes; if that number is exceeded, congestion occurs with a consequent adverse affect on traffic safety, passenger and public safety, exhaust and emission hazards, and efficient vehicle movement.

34. Additional testimony revealed another justification for restricting the commercial service lanes to "demand" vehicles. The nature of "demand" vehicle service is that "demand" vehicles move quickly through the commercial service lanes because they pick up passengers only if the passenger is absolutely ready to board the vehicle. If not, the vehicle never stops and moves on. When the passenger later becomes ready to board, the next demand vehicle of the type desired will then pick up the passenger with a minimum of delay time. A limousine, on the other hand, would enter the lanes to pick up passengers, but the concern would be that they might not be ready to board as the limousine pulls into the curb area. Because the passengers can be picked up only by that limousine, the limousine becomes a captive to the curbside area and must wait there until the passengers are ready to board. Such a potential delay in an already-congested area is incompatible with the airport's need for efficient movement in the commercial service lanes.

35. Other reasons were adduced by the Aviation Director and the Traffic Engineer in support of the airport's assignment of limousines to the public lanes:

a. Because the amount of curbside available for any vehicle to park at the curb is finite, permitting "stretch" limousines of approximately 22 feet, 4 inches in length to make use of limited curbside areas in the LVD would not be an efficient use of the inner lanes. Taxicabs average only 17 feet in length. Limousines are

therefore 31.3% larger, on average, than taxicabs.

b. The turning radius of a stretch limousine would cause considerable problems in the commercial service lanes. As testified to by the Traffic Engineer, a stretch limousine of the standard length of 22 feet, 4 inches requires a greater turning radius in which to turn. Therefore, for a stretch limousine to pull up to a curbside area, the curbside area must be totally clear at least 2½ lengths ahead of the limousine to permit the limousine to pull into the curb from the middle travelling lane. Backing a limousine into the first lane would be difficult, for frequently the third or outermost commercial service lane, which a limousine must use to accomplish a backing maneuver, is occupied by other vans and vehicles, and no backing in would be possible. And, as testified to by Mr. Elder, the process of backing a stretch limousine to a curbside point takes up two of the three inner lanes, thus closing those lanes of traffic during the backing process and leading to greater congestion and emission problems.

36. As to usage of the three public lanes, videotapes and testimony show that these lanes are also congested; but the fact that two of the three lanes are moving lanes permits an accommodation of the traffic assigned to those lanes. The County has determined that vehicles using the public lanes should include private cars, off-airport non-demand rental car company courtesy vans, all courtesy vans of other commercial users (such as motels, hotels, off-airport parking lots, etc.), and limousines.

37. The bus loop area is located adjacent to the public lanes on the LVD but unlike the commercial service and public lanes of the LVD, the bus loop area has no drive above it. Accordingly, it can accommodate vehicles of greater height, such as large buses. The buses include those primarily serving the Seaport, but there are some buses serving other areas as well. Additionally, the Aviation Department has assigned crew pick up vans to use the bus loop to meet airline crew members.

38. Turning now to other aspects of the regulatory provisions applicable to limousines at the airport, the Board of County Commissioners in 1977 adopted Resolution No. R–166–77 which provided in part that:

... this Board approves the recommended fees and charges for the use of certain landside ... facilities at Miami International Airport by commercial operators for ground transportation purposes as set forth in the attached memorandum from the County Manager, and this Board hereby establishes the recommended fees and charges as being fair and non-discriminatory for the use of the facilities described in the said memorandum; and authorizes the implementation thereof through the issuance of appropriate permits issued pursuant to the provisions of Chapter 25....

39. The Aviation Department subsequently issued its operational Directive No. 24, effective as of November 1, 1980, which divided ground transportation services into 4 classes:

Class A   Prearranged Interstate Service
Class B   Intrastate Service
Class C   Airlines Crew Service
Class D   Expedite Service

40. Service Zones were established for pick up points for each of the four classes. As shown by OD 24's Exhibit D–1 and D–1A, the pick up zones for Class A vehicles on the LVD, of which limousines are a part, were located in the outer "public" lanes.

41. Each permit for Class A or B service required a $2,500 minimum security deposit, payment of $10 per trip for vehicles with less than 38 passengers, and $20 per trip for vehicles with 38 or more passengers.

42. According to the testimony of Mr. Elder, the airport has been reviewing the procedures outlined in OD 24 and in fact has presented to the Board of County Commissioners a revised form of OD 24 with a request to approve a new fee structure and security bond applicable to limousines. It would not change the basic regulatory provisions as to limousines, in that limousines would still be assigned to the public lanes.

Mr. Elder noted that the changes were motivated by the Department's desire for OD 24 to encompass all commercial ground transportation providers using the airport's landside facilities, and to allocate to each user an appropriate portion of the cost of operating the landside and reflecting the relative benefits to the users. Accordingly, because revised OD 24 will encompass a greater number of ground transportation providers and be able to spread the airport costs among such greater number, the airport will be able to reduce the per trip fees to be paid by limousines.

43. The airport recently dedicated three parking spaces for limousines on the UVD. Limousine drivers may park in either the holding lot near Concourse B (where the taxicab holding lot is located) or in any one of the four parking buildings in the front of the Terminal Building, or in these three parking places. After parking the limousine, the driver ordinarily walks to the gate, the Concourse, or bag area to wait for the passenger. There the driver may hold a sign bearing the passenger's name. When the passenger is met, the driver helps the passenger get any bags from the bag claim area, and they proceed to the curbside area of the public lanes where the passenger waits for the driver to pull the vehicle around.

44. *See* Docket Entry Number 29 which is a revised OD 24 dated *November 20, 1990,* copies of which were furnished to all parties and upon which further comment appears hereafter.

### CONCLUSIONS OF LAW

■ A. Plaintiffs clearly have the burden of showing that their classification for regulatory purposes under OD 24 denies them equal protection of the laws. In *Minnesota v. Clover Leaf Creamery Company,* 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981), the United States Supreme Court referred to the burden established in *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 950, 59 L.Ed.2d 171 (1979), i.e.,

[T]hose challenging the legislative judgment must convince the court that the

legislative facts on which the classification is apparently based could not be reasonable conceived to be true by the governmental decisionmaker.

■ B. No fundamental rights or suspect classifications are involved in this case. Like the regulatory provisions dealt with in *Prieto v. Metropolitan Dade County,* 718 F.Supp. 934, 937 (S.D.Fla.1989),

the challenged provisions in OD 24 are not based on race, religion or alienage, nor do they involve the infringement of a fundamental right. See [*City of New Orleans v.*] *Dukes,* 427 U.S. [297] at 303–04, 96 S.Ct. [2513] at 2516–17 [49 L.Ed.2d 511 (1976)]; *Harper v. Lindsay,* 616 F.2d 849, 854 (5th Cir.1980) (both holding that the right to pursue a business is not a fundamental right for the purposes of equal protection analysis).

■ C. Plaintiffs' burden must overcome the presumption of validity that attached to the economic regulatory measure contained in OD 24. In *Alamo Rent–A–Car v. Sarasota–Manatee Airport Authority,* 825 F.2d 367, 370 (11th Cir.1987) (hereafter *"Alamo 1"* in distinction to the *Alamo* case on appeal after remand, at 906 F.2d 516 (11th Cir.1990) (hereafter *"Alamo 2"*), the Eleventh Circuit Court of Appeals held that:

Legislation, such as that involved in this case, that does not impinge on fundamental rights or employ suspect classifications is presumed to be valid and will be upheld if it is rationally related to a legitimate state interest. [citing case] Moreover, the equal protection clause allows governmental bodies wide latitude in enacting social and economic legislation; the federal courts do not sit as arbiters of the wisdom or utility of these laws.

■ D. The same burden applies to plaintiffs' challenge to the regulatory measure on interstate commerce grounds. In *Park N. Fly of Texas, Inc. v. City of Houston,* 327 F.Supp. 910 (S.D.Tex.1971), the court stated that:

The presumption at the outset is that the ordinance is reasonable and desirable, and the burden is on the plaintiff to show

that the measure unduly burdens interstate commerce in that the controls imposed in no way enhance the public safety or convenience, or that, even if there is a genuine purpose to be served by the law, it is fulfilled in an unreasonable or arbitrarily discriminatory manner. (327 F.Supp. at 922)

Plaintiffs therefore have a heavy burden to convince this court that the challenged regulations imposed on them at the airport deny them equal protection of the laws. The plaintiffs have a lesser burden—but the burden nonetheless—to show that the regulations unlawfully discriminate against them.

E. Plaintiffs claim that they are denied equal protection of the laws as a result of County's disparate treatment of limousines under OD 24 vis-a-vis taxicabs, with which limousines are claimed to be similarly situated. In analyzing equal protection claims of this type, the Supreme Court held in *City of New Orleans v. Dukes,* 427 U.S. 297, 303–4, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976) that:

> When local economic regulation is challenged solely as violating the Equal Protection Clause, this Court consistently defers to legislative determinations as to the desirability of particular statutory discriminations. [citing cases] Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest. States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude. Legislatures may implement their program step by step ... in such economic areas, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations. In short, the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.... [I]n the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment.

And see *Alamo 1,* supra, 825 F.2d 367, 370 ("the equal protection clause allows governmental bodies wide latitude in enacting social and economic legislation; the federal courts do not sit as arbiters of the wisdom or utility or these laws").

█ F. Based on the testimony and evidence adduced by the parties, the Court finds that OD 24 is rationally related to a legitimate governmental interest and is not a denial of plaintiffs' right to equal protection of the laws.

G. The Court concludes that the underlying purpose behind the regulatory provisions of OD 24 is the control of congested roadways on the landside of the airport. Control of traffic is a classic example of a legitimate governmental interest. In *Bradley v. Public Utilities Commission,* 289 U.S. 92, 53 S.Ct. 577, 77 L.Ed. 1053 (1933), the Court upheld the denial of a certificate of public convenience and necessity for a trucker seeking the right to use a particularly congested highway between two cities, where the Commission's denial was for the stated purpose of promoting public safety.

H. By virtue of County's Home Rule Charter, Chapter 125, *Florida Statutes,* and County's ordinances adopted pursuant to these powers, County clearly has the authority to regulate vehicle traffic and classify vehicles in the manner provided in OD 24.[2] The County's powers set forth

---

**2.** In *Miami Beach Airline Service, Inc. v. Crandon, et al.,* 159 Fla. 504, 32 So.2d 153, 155 (1947), the Supreme Court of Florida, in upholding an exclusive contract between Dade County and Red Top Sedan to provide bus transportation from Miami International Airport to points within Dade County, stated that "When a governmental entity is authorized to exercise a power purely proprietary, the law leans to the theory that it has full power to perform it in the

above in Paragraph 12 *et seq.*, clearly enabled the County to adopt regulatory measures at the airport for the public safety, welfare and convenience.

I. The regulatory measures provided in OD 24 are rationally and reasonably related to the legitimate governmental purposes of traffic and emission control as demonstrated by County in this case. Plaintiffs have presented no evidence to dispute the County's assertion that the landside capacity of the LVD is extremely limited and must be monitored constantly to make certain traffic does not become congested and a safety hazard to vehicles and pedestrians alike. County's uncontroverted evidence shows that the commercial service lanes are capable of handling a limited number of vehicles, especially considering that only one of the three lanes can accommodate moving traffic. The ideal number of vehicles in the commercial service lanes, as testified to by County's Vehicle Traffic Engineer, is 250 vehicles per hour which is exceeded on several occasions during the course of the day. County properly and reasonable concluded that the commercial service lanes should handle only those vehicles providing "demand" ground transportation services, and that limousine service—because it does not provide demand service and because its stretch vehicles would cause considerable maneuverability problems in the commercial service lanes—should be assigned to the public lanes.

J. County also showed convincingly that its concerns over vehicle emissions properly led to its decision to assign limousines to the public lanes. In those lanes, limousines are less likely to cause congestion problems which in turn results in less vehicle emissions in the LVD area.

K. Finally, County's Vehicle Traffic Engineer testified that the method followed by County in assigning the various types of vehicles to the available lanes was the most efficient and safe assignment possible under the circumstances. Plaintiffs have not provided any contrary expert evidence in this regard, and the Court agrees with the conclusions of such Engineer.

L. For the reasons stated above, this Court holds that County has sufficiently demonstrated that its vehicle assignment policy in the LVD is rationally related to a legitimate governmental purpose and that its vehicle regulatory measures applicable to limousines at the airport must be upheld.

M. The County properly classified limousines and taxicabs separately for regulatory purposes under OD 24. The cases are clear that the County enjoys a broad right to classify businesses or types of operations and impose different regulatory provisions on such differing classifications. As the *Alamo 1* court noted:

"Differences in the types of business conducted by these companies is certainly a factor in equal protection analysis, and in some cases this distinction alone may be sufficient to uphold the challenged legislation." (825 F.2d at 370)

N. The type of business conducted by taxicabs is quite different from that provided by limousines, and the method and equipment by which that business is provided differs significantly as well. For example:

a. Taxicabs provide "demand" service for passengers arriving at the airport who have not arranged for any transportation prior to their arrival. Limousine services, on the other hand, are pre-arranged by the passengers before they start their interstate travel.

b. Because taxicabs provide a "demand" service involving many taxicabs, taxicabs must wait in a holding area for a period of time of up to two hours, are metered out of the holding area one-by-one, and they form a line at the curbside to wait their turn to pick up passengers. They are dispatched on a first in/first out basis as they are needed. Thus when a cab is engaged and ready to depart the airport, it will never be clocked in by another cab waiting for a passenger. There is no room on the roadways of the LVD for limousines, however, to queue themselves, and the opportunity for worsened congestion of a

same efficient manner as a private person would do."

non-queued vehicle justifies the different classification of limousines for regulatory purposes.

c. Taxicabs have meters and charge by the distance involved. Limousines do not charge by a meter but rather establish their charges on an hourly basis. Limousines charge a great deal more for their service than do taxicabs.

d. Limousines are larger in dimension and style than taxicabs and present an entirely different type of traffic control problem for the airport. Taxicabs are standard size vehicles and are easily accommodated in the roadways of the LVD.

e. Limousines are luxury vehicles which may include interior amenities of a bar, television, and telephones. Taxicabs do not offer these amenities and are basically family cars with meters in them.

f. Finally, the number of passengers served by taxicabs greatly exceeds the number served by limousines, and County must therefore accommodate significantly more taxicabs at the airport than limousines.

O. Additional justification for the separate classification of limousines is found in *Executive Town & County Services v. City of Atlanta*, 789 F.2d 1523 (11th Cir.1986). In upholding an airport regulation requiring limousines to charge customers not less than $50 for limousine passengers being picked up at Atlanta's Hartsfield Airport, the court noted that the airport properly could classify all providers of commercial ground transportation services into "niches". The minimum fare requirement ensured that "each of [the different] modes of transportation can find a niche in which to fit in the City's transportation network." *Id.* at 1527, f.n. 8. The court's recognition of the "different mode" of transportation provided by limousines vis-a-vis taxicabs at Atlanta's airport is equally applicable to Miami's airport and constitutes another recognizable difference between taxicabs and limousines.

P. The differences outlined above justify the County's classification of limousines separately from taxicabs and County's reg-

ulation of limousines separately under OD 24. It therefore follows that plaintiffs are not denied equal protection because their limousines are regulated in a manner differently than taxicabs.

Q. In *Alamo 1, supra*, at 370–71, the Court analyzed the airport's regulatory provisions applicable to courtesy vehicles of hotels, motels, and off-airport rental car companies and stated that

> Even assuming, however, that off-airport car rental companies and hotels and motels are similarly situated for purposes of a user fee on courtesy vehicles, the Authority's scheme of user fees does not lack a rational basis and is not a 'wholly arbitrary act,' *City of New Orleans v. Dukes*, 427 U.S. 297, 303–04, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976).

R. Thus, even if taxicabs and limousines were similarly situated, County could regulate the two differently if such regulation were rational and not wholly arbitrary. Nothing has been shown to this Court that even remotely suggests County's OD 24 was arbitrarily drawn. On the contrary, as shown in the following discussion, OD 24 provides a rational and reasonable solution to a complex and significant vehicle congestion problem on the roadways at MIA.

S. The case of *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) provides a concise statement of the standard of review of economic regulatory provisions alleged to unduly burden interstate commerce:

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits [citing case]. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of that burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

T. The Court must also take into account certain additional factors in its analysis:

█ a. The "burden" that is offensive to the commerce clause is one that is an "undue" or "unreasonable" burden. A burden which "incidentally" affects it will not be struck down. *Alamo 2, supra.* 906 F.2d at 522.

█ b. If the regulatory burden is discriminatory against out-of-state companies vis-a-vis local ones, the measure will likely be struck down. *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935).

c. If the burdens imposed by the regulatory measure apply only to local interests, the Court is entitled to consider whether "inner political checks are available to the local interests which would permit a legislative rather than a judicial solution to the claim of discrimination." *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 767 n. 2, 65 S.Ct. 1515, 1519 n. 2, 89 L.Ed. 1915 (1945).

█ d. Finally, regulatory measures clearly in furtherance of public safety generally receive judicial approval. See *Pike v. Bruce Church, Inc., infra,* 397 U.S. at 143, 90 S.Ct. at 848 ("We are not, then, dealing here with 'state legislation' in the field of safety where the propriety of local regulation has long been recognized ...".); *accord, Executive Town & Country Services, supra.*

█ U. With these principles in mind, this Court concludes that the regulatory provisions in County's OD 24 are valid and reasonable and do not constitute an unreasonable burden on interstate commerce.

V. First, in making allocations of the roadways among the commercial users of the LVD, it is clear that County is not discriminating in favor of local commerce. The Court takes judicial notice that the airport is located at the southern tip of Florida more than 300 miles by land from the nearest state border. As a practical matter, therefore, vehicles using the airport are virtually all local.

W. Second, the County does not discriminate against interstate commerce in its assignments of vehicles. The Court finds that demand vehicles in the inner commercial service lanes consist of (a) intrastate taxicabs, (b) intrastate shuttle buses, and (c) largely interstate on-airport rental car company courtesy vans. See *Park 'N Fly of Texas, Inc. v. City of Houston, supra,* (off-airport parking lot courtesy vans involved in interstate commerce); and see *Alamo 2, supra,* (holding, in effect, that off-airport rental car company courtesy vans were involved in interstate commerce). Vehicles in the outer public lanes consist mostly of intrastate local traffic and plaintiffs' interstate limousines. Vehicles allocated to the "bus loop" area consist of interstate and intrastate large bus service and crew pick-up service. Interstate and intrastate vehicles are thus spread around the available lanes in the LVD more or less equally. Neither intrastate nor interstate vehicles are singled out for favorable treatment in the County's assignment process.

X. The five plaintiffs in this case are all Florida companies doing business in Dade County, and thus have the requisite "inner political checks" that enable them to seek a legislative solution to their claim of discrimination. While such "checks" cannot absolve what would otherwise be an undue burden on interstate commerce, such checks can be taken into account where the question of the burden on interstate commerce is in doubt. The Court has no such doubts in this case, but notes that, even if doubts were present, they would likely be overcome given the inner political checks available to plaintiffs to resolve their claim of discriminatory treatment.

Y. As to the nature of the putative local benefits involved, County's evidence showed the primary basis for OD 24 was the severe vehicle traffic congestion problem in the LVD. Faced with a multitude of vehicles that legitimately require access to the airport, the Aviation Department reasonably allocated the paucity of available roadways among these users in a manner which the Court concludes is fair and rea-

sonable in order to achieve safe and efficient movement of traffic in the LVD. Clearly, such regulatory benefits exceed whatever burden may be placed on plaintiffs. And, plaintiffs have failed to show that their goals could not be promoted better with a lesser impact on interstate commerce.

Z. The extent of the burden on interstate commerce is minimal at best. The nature of plaintiffs' business requires that their limousines be parked in advance of the passengers' arrival in order for the drivers to meet the passengers at their arrival gates or the bag loading area. Plaintiffs do not claim that they should have the right to park their limousines in the commercial service lanes while searching for the passengers. Therefore, even if limousines could use the inner commercial service lanes, the limousines would still have to park elsewhere while they locate their passengers inside the Terminal Building. And, plaintiffs have failed to present a workable plan whereby the complained of delays could be avoided by providing plaintiffs access to the commercial lanes.

AA. Plaintiffs have not satisfied their burden of proof that interstate commerce has been "burdened" in a constitutionally protected sense. To the contrary, all plaintiffs have shown is that their passengers, who have paid a considerable premium for the benefit of a higher class service, suffer some inconvenience by walking across various lanes in order to arrive at their pick-up point. Although plaintiffs have testified that they have "lost" passengers because some passengers have decided to take other transportation when the drivers were delayed in returning to them, such a loss does not rise to the level of an "undue" or "unreasonable" burden on interstate commerce, especially where plaintiffs have not shown that access to the inner commercial lanes would result in fewer "lost" passengers.

BB. On this point, *Alamo 2, supra,* is instructive. There, the Court considered the airport's restriction of more than one courtesy van at a time on the airport premises. Noting that the "single van restric-

tion was designed to avoid the local problem of courtesy van congestion at the airport", (906 F.2d at 522), the court held that

> [T]he single van restriction imposes only a minimal burden on interstate commerce, at most requiring deplaning passengers who want to rent an off-airport car to wait a little longer for the van to pick them up. *Id.*

As in *Alamo 2*, the burden imposed on plaintiffs by OD 24 at Miami International Airport is that plaintiffs' passengers may have to "wait a little longer for the [limousine] to pick them up."

·CC. Turning now to the matter of fee charges for limousines vis-a-vis taxicabs, it should first be noted that under date of *November 20, 1990*, OD 24 was revised from its prior form extant since November 1, 1980. The changes were as follows:

a. **Minimum Insurance Requirements—November 1, 1980** were:

**General liability coverage**
| | |
|---|---|
| Bodily injury | $300,000 per occurrence |
| Property damage | $100,000 per occurrence |

**Automobile liability insurance**
| | |
|---|---|
| Per person | $100,000 |
| Bodily injury | $300,000 per occurrence |
| Property damage | $100,000 per occurrence |

**November 20, 1990**

**General liability coverage**
$300,000 combined single limit per occurrence for bodily injury and property damage.

**Automobile liability coverage**
| | |
|---|---|
| Per person | $50,000 |
| Bodily injury | $100,000 per occurrence |
| Property damage | $20,000 per occurrence |

b. Revised OD 24 reduces the amount of the minimum security deposit, from $2,500 per permit to $500 per permit for limousines.

c. Revised OD 24 reduces the "per trip" charge from $10 per trip to $2.50 per trip for limousines.

This Court finds that the precipitating cause for these very substantial changes and reductions in fee schedules was the filing of this law suit in September, 1989. Prior to that time, testimony at trial indicated that representatives of the plaintiffs had repeatedly met with defendant's representatives seeking an agreed reduction schedule of fees and likewise seeking changes in the usage of various lanes of traffic for and by limousines. Repeated efforts at the administrative level produced

no results, even though there was an aborted attempt by the Aviation Department at one time to submit a reduced fee schedule to the Metro Commission. However, the matter was not then addressed by the Metro Commission. Not until this case was filed and tried did Metropolitan Dade County adopt revised OD 24 on November 20, 1990. As adopted, it went even further in reduction of fees for limousines than the discussions which had been held amongst the parties prior to the litigation. Equally as important, it evolved through an open process of Public Hearings as required by law.

DD. Revised OD 24 which brought about those reductions in fee charges (Docket Entry No. 29), contains the following finding therein by the Metro Dade Commission, to-wit:

Permit fees for this Operational Directive have been established by the Board of County Commissioners to assure the equitable allocation of the Airport resources to each of the services necessary to accommodate the reasonable needs of the public, and to assure that all commercial users of such Airport facilities, within each general and sub-classification, are assessed an Airport user fee for the use of the County's facilities that is *fair and equitable and does not unjustly discriminate between Permittees within a specific sub-classification, when compared to the fees or charges paid by those providing substantially similar services, and the benefits they receive, under contract with the Airport.* [emphasis supplied]

It should be noted therefore that the County deemed the reduction in fee charged to bring about a fair, equitable and non-discriminatory set of fees or charges, and confirms the allegations and positions taken previously by the plaintiffs during their prior years of negotiations which brought about the very relief hereinabove described.

EE. During the course of the trial, the plaintiffs introduced testimony claiming losses due to the $10 limousine charge

since September, 1989 (the filing of this law suit) as follows:

| | |
|---|---|
| Campanile Motor Service, Inc. d/b/a Club Limousine Service (Michael Campanile) | $29,000 |
| Limousines of South Florida, Inc. (Mark Levitt) | $13,000 |
| Aragon Motors, Inc., d/b/a Cars of the Rich & Famous Limousine Service (Neil Goodman) | $13,000 |
| Red Top Sedan Service, Inc. (Elliott Heckert) | $12,000 |
| American V.I.P. Limousines, Inc. (Edward Van Harrasz) | $4,200 |
| **TOTAL** | **$71,200** |

The Court is uncertain as to whether the figures submitted constitute the difference per vehicle based upon a difference of $10 versus $2.50 per vehicle or otherwise. The Court is also uncertain as to whether these amounts include differentials in costs due to the changes in required insurance coverage. For these reasons, while the Court is holding at this time that the plaintiffs are entitled to the losses attributable to such changes in fee schedules, judgment will be withheld from entry thereon until these losses have been classified. This may already be contained in the record before the Court. Accordingly, WITHIN TEN (10) DAYS, each plaintiff shall submit either in a joint submission or individually, in writing, its claim for damages based upon the existing record, showing how the claim is computed. Defendant may respond thereto WITHIN TEN (10) DAYS thereafter, in writing. If an evidentiary hearing is necessary on the monetary awards, it will be held, and for that reason, particularly, entry of judgment will be delayed until the further Order of the Court.

FF. If plaintiffs have any legal basis to claim attorney's fees for the portion of this judgment upon which they prevail, they shall file a motion requesting attorney's fees WITHIN TEN [10] DAYS, together with a memorandum of law citing and supporting statutory or other authority authorizing the granting of same. Defendant may respond thereto WITHIN TEN [10]

DAYS THEREAFTER. If the parties agree that attorney's fees can be recovered, it is suggested that they attempt to agree on the amount and if not, affidavits can be submitted by the plaintiffs and opposed by the defendant on the subject of the award of attorney's fees, if any. An evidentiary hearing will be held, if necessary. Plaintiffs shall recover their costs to be taxed by the Clerk of Court upon the filing of a bill of costs, but limited to those costs related to recovery of fees and charges and not with regard to the request for relief as to lane usages, road patterns or other similar matters. Issuance of a judgment shall be STAYED pending determination of the matters reserved herein.

GG. The Court finds no Constitutional, Statutory or other basis upon which to grant relief to the plaintiffs with regard to their complaints related to lane facilities, roadways and traffic regulation.

FF. The version of OD 24 at issue in this case was last revised on November 1, 1980. At the meeting of the Metro Board of County Commissioners in Public Session on November 20, 1990, OD 24 was revised. A copy of such revision appears in this action as docket entry Number 29, with copy having been furnished to plaintiffs' counsel.

DONE and ORDERED.