Teri DAVIS d/b/a Dependable
Limos, Plaintiff,

v.

MIAMI–DADE COUNTY BOARD OF
COUNTY COMMISSIONERS, acting
as the Miami–Dade County Aviation
Authority,[1] Defendant.

No. 04–21229–CIV.

United States District Court,
S.D. Florida.

Oct. 24, 2006.

1. According to Defendant, the Miami–Dade County Board of County Commissioners, a political subdivision of the State of Florida, acts on behalf of its Aviation Department, not as an "Aviation Authority." Defendant's Answer, filed June 28, 2004.

Jolyon Wilson Morris, Miami, FL, for Plaintiff.

Thomas Philip Abbott, Aviation Department, Cynji Antoinette Lee, Miami–Dade County Attorney's Office, Miami, FL, for Defendant.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

HOEVELER, Senior District Judge.

This cause comes before the Court upon the parties' motions for summary judgment. This Court held a hearing on the motions on October 14, 2005.

### BACKGROUND

The Amended Complaint, filed June 10, 2004, seeks a declaratory judgment[2] regarding the constitutionality of Defendant's requirement that Plaintiff's Palm Beach County-based limousine service obtain permits and pay a $2.50 per visit fee in order to be allowed to enter Miami International Airport (MIA) to drop off passengers from Palm Beach County. Neither the permits nor the fee are imposed on taxis from Palm Beach County. The permit also requires proof of a minimum level of automobile and general liability insurance on the limousines. Plaintiff seeks an injunction[3], and claims that when she has attempted to deliver passengers to MIA she has suffered repeated traffic fines (although she admits that the traffic citations issued at MIA are dismissed each time she appears in court), been threatened with arrest, and that—as a result of her decision not to travel to MIA—she has lost thousands of dollars in fares during the several years that this requirement has been in place. Plaintiff asserts that MIA is one of only a few airports that impose such a fee, and may be the only one to do so on a per trip basis, and that

2. 28 U.S.C. § 2201.

3. 28 U.S.C. § 2202.

there is insufficient justification for the fee or the insurance requirements. Plaintiff asserts that the regulation at issue violates the equal protection clause of the Fourteenth Amendment by treating taxis and limousines differently, and that it violates the commerce clause of the United States Constitution because of the undue burden placed on Plaintiff's role in interstate commerce. The Amended Complaint also includes state law claims for malicious prosecution and abuse of process.

Defendant admits that the requirements are as stated by Plaintiff, and that such requirements are not imposed upon taxis, but argues that it had a rational basis for imposing the fee and insurance requirements, that it imposes them fairly on all limousines (not just those from Palm Beach County), and that imposition of the fee upon limousines—and not taxis—is justified because they are different and cause more "cost" to the airport facility than taxis by increasing roadway congestion while serving less passengers. Defendant also notes that its fee is consistent with fees charged at other airports and offers expert testimony in support of this assertion.[4] Defendant argues that Plaintiff cannot bring the malicious prosecution and abuse of process claims because Plaintiff failed to comply with Fla. Stat. § 768.28 (waiver of sovereign immunity in tort actions requires written notice to the agency), and that Plaintiff has failed to state any basis for relief under these theories even if she had provided the statutory notice as to these claims.

*ANALYSIS*

To succeed on a summary judgment motion, the moving party must establish that the weight of all the evidence, considered in a light most favorable to the non-moving party, demonstrates that there are no triable issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Under this strict standard, summary judgment is appropriate only if the record evidence shows that the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed. R.Civ.P. The non-moving party may not rest upon mere allegations or denials in his/her pleadings, but must set forth specific facts, through affidavits or other forms of evidence provided for by the rules. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The parties each have filed statements of "disputed facts," and Plaintiff has filed a statement of "undisputed facts." The Court has determined, however, that there is no dispute as to the material facts in this case, and that there is sufficient legal precedent for the entry of summary judgment for the Defendant.

The following represents a summary of the undisputed facts. The challenged requirement is found in the County Aviation Department's Operational Directive No. 90–24 (hereinafter OD–24). Exhibit A, Defendant's Exhibit List filed June 17, 2005. Originally adopted on November 1, 1980, OD–24 subsequently has been revised; the version at issue herein was effective as of July 25, 2002. Specifically, the current title of OD–24 is "Ground Transportation Service Permits, Opera-

---

**4.** Defendant offers as expert testimony the declaration of Dr. Ray Mundy, Director of the Center for Transportation Studies and a Professor of Transportation at the University of Missouri—St. Louis, and Executive Director of the Airport Ground Transportation Association (AGTA) since 1976. The AGTA studies

and reports on all aspects of ground transportation activities at airports throughout North America, and provides economic and operating advice on issues related thereto. Declaration of Dr. Ray Mundy, dated June 15, 2005, ¶ 5.

tional Directive No. 90–24." Declaration of Dr. Ray Mundy, dated June 15, 2005, ¶ 11. OD–24 includes multiple classifications of ground transportation service providers. Limousine services, like Plaintiff's, fall within General Class A—Prearranged Service (along with buses and vans that provide similar pre-arranged services). Declaration of Dr. Ray Mundy, ¶ 14.[5]

In order to obtain a permit under OD–24, a company submits the permit application, along with a copy of its occupational license, vehicle registrations for all vehicles listed on the application, a copy of County "For Hire" permits and proof of insurance coverage, in addition to a security deposit of $500 for operators with less than ten (10) limousines. The insurance required is: automobile liability insurance in the amount of not less than $100,000 per person, $300,000 per occurrence, and $50,000 per occurrence for property damage, plus general liability insurance coverage of $300,000. Declaration of Monica Beltran, dated June 9, 2005, ¶ 11. After a permit is obtained, the company receives a transponder, a small plastic box that electronically connects to receivers that are part of the Miami–Dade Aviation Department's "Automatic Vehicle Identification" system, and a transponder is installed in each vehicle subject to the permit. The transponder then records activity each time the limousine passes under one of the electronic receivers located in separate places on the airport roadway system. At the end of each month, the number of trips for the limousines and the applicable charge of $2.50 per trip is placed on an invoice and sent to each limousine company. Declaration of Monica Beltran, ¶ 12.

*Equal Protection Clause*

■ Because Plaintiff's equal protection claims involve neither a suspect class nor a fundamental right, they are subject to the rational basis test. "If an ordinance does not infringe upon a fundamental right or target a protected class, equal protection claims relating to it are judged under the rational basis test." *Gary v. City of Warner Robins,* 311 F.3d 1334, 1337 (11th Cir. 2002), *citing Joel v. City of Orlando,* 232 F.3d 1353, 1357 (11th Cir.2000). To prevail in their motion for summary judgment, the Defendant must show that OD–24 is "rationally related to the achievement of some legitimate government purpose." *Joel,* 232 F.3d at 1357; *see also Haves v. City of Miami,* 52 F.3d 918, 921 (11th Cir.1995) (citations omitted). This standard is "highly deferential." *Gary v. City of Warner Robins,* 311 F.3d at 1339; *see also Alamo Rent–A–Car, Inc. v. Sarasota–Manatee Airport Authority,* 825 F.2d 367, 370 (11th Cir.1987). It is well established that legislation that does not affect fundamental rights or employ suspect classifications is "presumed to be valid and will be upheld" if it passes the rational basis test. *Alamo,* 825 F.2d at 370, *citing City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

---

**5.** Regarding the "prearranged" nature of the service Plaintiff provides, she asserts that she tries to avoid traveling to MIA but that there is a local regulation, i.e. in Palm Beach County, that requires limousine drivers (and taxi drivers) to take passengers to their desired destination, so that a trip to MIA is sometimes unavoidable once a passenger is picked up by Plaintiff's limousine service. This assertion—which is not material to the issues herein—is effectively disputed by the Declaration of Dennis Moore, who is the Director of the Consumer Affairs Division of Palm Beach County, and who is responsible for enforcement of all of that County's regulations relating to vehicles for hire, including taxicabs and limousines. "[A] limousine driver or a taxicab driver may decline to take a passenger to the passenger's desired destination, and the Passenger Bill of Rights does not provide otherwise." ¶ 7, Declaration of Dennis Moore, dated August 4, 2005.

The Court's assessment of this case is guided by prior rulings by other courts. As a preliminary matter, the authority of the Defendant Miami–Dade County Commission to govern MIA through its Aviation Department is not in question. Indeed, the specific regulation challenged herein has been the subject of a prior decision, *American V.I.P. Limousines, Inc. v. Dade County Board of County Commissioners*, 757 F.Supp. 1382 (S.D.Fla.1991). In that case, limousine operators challenged the fees imposed by OD–24 and also complained about being excluded from traveling in the commercial lanes of traffic on the airport roadways. While that case was pending, the County amended OD–24 to reduce the original per trip fee on limousines from $10 per trip to its current $2.50 per trip, and to reduce the security deposit from $2,500 to the present $500. (The insurance provisions were identical to those in place today.) The decision in that case noted that the modification to OD–24 was designed "to encompass a greater number of ground transportation providers and ... spread the airport costs among such greater number." *American V.I.P.*, 757 F.Supp. at 1393. It is precisely that distribution of public costs which is at the heart of the present case.[6] Indeed, in light of the reported financial situation at MIA, one of the busiest airports in the country[7], it appears that the imposition of user fees is even more appropriate today than it was fifteen years ago.

The airport system's operating budget is $566.5 million (fiscal year 2005), of which $144 million is for debt service obligations on approximately $3.2 billion in outstanding bonds. Of the operating budget, $9.6 million relates to the costs of the Landside Division.[8] Of the debt service amount, approximately $10 million relates to Landside improvements. In addition, the current Capital Improvement Program of $4.8 billion includes additional roadways and facilities. Declaration of Susan Warner Dooley, dated June 15, 2005, ¶¶ 3, 6. Susan Warner Dooley, Assistant Aviation Director for Business Management for the County's airport system, describes the airport system as "financially self-sufficient" and notes that the system receives no County tax dollars for its operations. Declaration of Susan Warner Dooley, ¶ 9.

Pursuant to a Trust Agreement entered into decades ago to secure the bonds necessary for the County's aviation properties, the airport is required to impose and collect charges for the use of its facilities in such an amount to yield a net revenue of 120% of the principal and interest payments due on the outstanding bonds for that annual period. Declaration of Susan Warner Dooley, ¶¶ 7, 8 (referencing Trust Agreement entered into in 1954, amended at various times, and now known as the Amended and Restated Trust Agreement of 2002—Exhibit A to Declaration of Susan Warner Dooley, dated June 15, 2005.) To meet the 120% net revenue requirement, MIA must net $172.8 million annually. *Id.*

The airport generated $292,375 from limousine-placed transponders for the seven month period of October 1, 2004, through April 30, 2005 (116,950 trips). Declaration of Monica Beltran, ¶ 13. In fiscal year 2004, MIA collected $499,375

---

**6.** The need to control and regulate vehicle traffic at a busy international airport was cited as additional support for OD–24 in the *American V.I.P.*, 757 F.Supp. at 1394.

**7.** According to Dr. Mundy, MIA is one of the fifteen largest airports in the United States in terms of passenger use. Declaration of Dr. Ray Mundy, ¶ 9.

**8.** "Landside" is the area involving vehicle services and facilities for passengers in the roadway areas that provide access to the terminal building.

from the per trip fee paid by limousines. Declaration of Susan Warner Dooley, ¶ 12. The approximately $500,000 annual revenue from the limousine fees represents 1/345th of the airport's required $172.8 million annual revenues. The airport's revenues from all users, include those subject to OD–24, do not cover all the debt service and operating costs of MIA. Declaration of Susan Warner Dooley, ¶ 3.

The Eleventh Circuit has had the occasion to address whether airport user fees, specifically fees imposed on limousines, meet the rational basis test under the equal protection clause. *Alamo Rent–A–Car, Inc. v. Sarasota–Manatee Airport Authority,* 825 F.2d 367 (11th Cir.1987). The facts in Alamo are similar to the facts before this Court. The airport authority in that case had imposed a set of user fees, including different fees for taxis and limousines. A monthly fee of four hundred dollars was imposed on limousine operators, which constituted 12% of their gross revenues attributable to airport passengers. *Id.* at 371. The Eleventh Circuit found that the distinctions drawn by the Sarasota–Manatee Airport Authority were based upon its "rational assessment of the relative benefits and extent of use of each category of vehicles that enter the airport." *Id.* at 371 (footnote omitted). While that decision did not address the specific regulations applicable to limousines, other than to note those provisions, the reasoning of the appellate court in that opinion is directly relevant to this Court's decision regarding Plaintiff's claims.

▇ This Court agrees with other courts' determinations that there are material differences between taxicabs and limousines with respect to their use of the airport roadways. Clearly the airport roadways can accommodate a larger number of taxicabs, carrying a greater number of passengers, more easily than a large number of limousines—particularly those with extended vehicle bodies.[9] The increased congestion caused by limousines represents a cost to the airport in terms of security and safety in the passenger loading areas. Declaration of Monica Beltran, ¶ 15. In addition, the use of MIA by limousines seeking to pick up passengers requires that specially designated parking areas be made available. Such areas are reserved exclusively for limousines, without a separate charge to the limousine operator. Declaration of Monica Beltran, ¶ 14.

Consistent with the appellate court's reasoning in the *Alamo* decision, the trial court in *American V.I.P.* held that "[t]he County properly classified limousines and taxicabs separately for regulatory purposes under OD 24.... The type of business conducted by taxicabs is quite different from that provided by limousines, and the method and equipment by which that business is provided differs significantly as well." *American V.I.P.,* 757 F.Supp. at 1395. That court cited approvingly to the following finding of the County Commission, "[OD–24's fees] have been established ... to assure the equitable allocation of the Airport resources to each of the services necessary to accommodate the reasonable needs of the public, and to assure that all commercial users ... are assessed [a user fee] for the use of the County's facilities that is fair and equitable ...." *Id.* at 1399.

In a section entitled "Policy," OD–24 itself indicates that its limitations on ground transportation service providers are designed "to assure an orderly and safe ground transportation [mix of vehi-

---

9. Plaintiff owns one six passenger and one ten passenger stretch limousine, in addition to standard sedans. Plaintiff's Deposition, December 29, 2004, pp. 5–6.

cles]" and that "[c]ompliance ... is essential for the benefit of all concerned to provide the best total ground transportation services under expected traffic, environmental, and other conditions at [MIA]." OD–24, ¶ IV.E. OD–24 requires that transportation providers meet several conditions, as indicated above, in order to obtain a permit for use of the airport facilities, but specifically states that such permits create no vested or exclusive rights. OD–24, ¶ IV.G. Further, Defendant, through OD–24, specifically reserved the right to "limit the size of Permittee vehicles and to specify the types of fuels that may be used ... by Permitte [sic] vehicles to protect Airport facilities and to maintain acceptable air quality levels." OD–24, ¶ IV.F

Dr. Mundy has opined that OD–24's requirements are "fair and reasonable" and "serve[ ] a definite public interest." He also reports that OD–24 is "consistent with similar regulatory measures of other airports in North America." Declaration of Dr. Ray Mundy, ¶¶ 13, 16. He specifies the following rationale for each aspect of OD–24:

* transponder use: for ease of allocating fees and to add a measure of safety in identifying otherwise similar looking vehicles (i.e., limousines) using the airport roadways
* transponder security deposit: the fee covers out-of-pocket cost of device and insures its return when no longer required by the ground transportation provider
* insurance (automobile and general liability): protects both the traveling passenger and the airport in the event of an accident
* per trip fee: for the cost of providing and managing the airport's roadways and ground transportation facilities.

Declaration of Dr. Ray Mundy, ¶ 13. The Plaintiff has offered no evidence to suggest that these proffered goals of OD–24 are illegitimate. At most, Plaintiff offers her own testimony that OD–24 is "an improper attempt reach [sic] beyond [the County's] borders to regulate and collect fees from businesses located outside its reach to offset the operating losses generated by MIA." Declaration of Teri Davis, dated July 8, 2005. Nothing in Plaintiff's statement, when evaluated in the context of the other evidence provided, compels this Court to conclude that OD–24 is invalid. Plaintiff may disagree with the conditions imposed, particularly the per-trip fee and the amount of general liability insurance required, but she is unable to demonstrate that the terms of OD–24 are constitutionally impermissible.

To uphold a challenged regulation, the Court need only identify a legitimate government purpose in support of OD–24, even if such a purpose was not stated by the enacting authority. "The *actual* motivations of the enacting governmental body are entirely irrelevant." *Haves v. City of Miami,* 52 F.3d 918, 921 (11th Cir.1995) (emphasis in original), *citing F.C.C. v. Beach Communications, Inc.* 508 U.S. 307, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). The Court has found that there are several purposes which could support OD–24, including the regulation and control of airport roadway traffic, the protection of the public safety, and the need to generate revenue from commercial users of the airport to support the provision of the airport facilities to the public.

As discussed above, there are sufficient differences between taxicabs and limousines to justify a different regulatory framework, and the fact that taxis are charged different fees or are not charged at all does not invalidate OD–24. *Alamo Rent–a–Car. Inc. v. Sarasota–Manatee Airport Authority,* 906 F.2d 516 (11th Cir. 1990). As Judge Gold, one of the most

respected members of this Court, has held, "[t]he County could have plausibly concluded that there was a rational basis to distinguish between taxis and limousines." *South Florida Taxicab Association v. Miami–Dade County,* 2004 WL 958073, *12, 2004 U.S. Dist. LEXIS 6730, *40 (S.D.Fla.2004). *See also Alamo,* 825 F.2d at 371; and discussion above, at page 9.

Having determined that there is a legitimate purpose for OD–24, the Court must determine whether there is a sufficient relationship between that purpose and the operative effect of OD–24, i.e., does OD–24 "further the hypothesized purpose." *Haves v. City of Miami,* 52 F.3d 918, 922 (11th Cir.1995). Again, the Court is guided by prior rulings. It is undisputed that the effect of OD–24 is to require that limousine operators carry specific minimum amounts of insurance, and pay a per trip fee for the use of the airport. As stated by Dr. Mundy, the insurance provisions guarantee that injured members of the public, or damage to MIA's property, will be compensated for, and the per trip fees allow the airport to monitor use of its roadways and to recover some of the costs of maintaining the airport roadway system. It bears observation that OD–24 has not operated to eliminate the provision of limousine service at the airport. As of April 30, 2005, there were 626 ground transportation companies with permits issued under OD–24, of which 380 were limousine companies. None other than Plaintiff had filed a formal objection to the terms of OD–24. Declaration of Monica Beltran, ¶ 10.

The Court need not agree with OD–24, as the only concern here is whether the Defendant could have believed that OD–24 furthered some legitimate government purpose. The question is not whether the legislation will "in fact" accomplish its goals, but whether the legislative body

"could rationally have decided" that it would. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 466, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) (sustaining a milk packaging regulation under the rational basis test because the regulation might foster greater use of environmentally preferable alternatives). As described above, the Court concludes that the Defendant could have believed that OD–24 advanced legitimate government purposes and, thus, this Court will not disturb their decision.

■ Plaintiff must demonstrate that "there is no possible legislative rational for enacting these regulations." *Executive Town & Country Services, Inc. v. City of Atlanta,* 789 F.2d 1523, 1528 (11th Cir. 1986). Plaintiff "must do more than submit evidence which calls the articulated purposes of the legislation into doubt. [She] must demonstrate that the [Defendant] could not have reasonably believed that the legislation would attain its aims." *Cash Inn of Dade, Inc. v. Metro. Dade County,* 938 F.2d 1239, 1244 (11th Cir. 1991), citations omitted. "The leniency of rational-basis scrutiny provides the political branches the flexibility to address problems incrementally and to engage in the delicate line-drawing process of legislation without undue interference from the judicial branch. It gives the legislative branch its rightful independence and allows the political branches of government to function properly." *Haves v. City of Miami,* 52 F.3d 918, 923–24 (11th Cir. 1995) (citations omitted). "A determination of whether a rational basis exists 'is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.'" *South Florida Taxicab Association v. Miami–Dade County,* 2004 WL 958073, 2004 U.S. Dist. LEXIS 6730 (S.D.Fla. 2004), *quoting FCC v. Beach Communica-*

*tions, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).[10]

Before turning to an analysis of Plaintiff's commerce clause claims, the Court must address the issue which frames a primary part of Plaintiff's argument in this case. Plaintiff argues that because § 31–602(b) of the Miami–Dade County Code, i.e. the Out-of County origin exception, permits Plaintiff to drop off her passengers at MIA, she therefore need not comply with OD–24. Plaintiff misreads the County Code, which states:

> Nothing in this article shall be construed to prohibit discharge within Miami–Dade County of any passenger lawfully picked up in another County and lawfully transported into Miami–Dade County. Notwithstanding any provision to the contrary, (1) Any passenger lawfully picked up in another county, transported to, and discharged at any location within Miami–Dade County, may be picked up at the discharge location and returned to the county of origin as long as the transportation is part of a pre-arranged, round-trip fare pursuant to a written contract, the limousine has complied with all of the regulatory requirements of the other county and the county where the passenger is picked up has adopted a similar provision; and (2) A limousine from another county may pick up a passenger at either the Miami International Airport (MIA) or the Miami–Dade Seaport (Seaport) and transport said passenger directly to the limousine's county of origin as long as the transportation is part of a pre-arranged one-way continuous fare pursuant to a written contract, the passenger arrived at either the MIA or the Seaport, the limousine has complied with all of the regulatory requirements of the other county and the county where the passenger is picked up has adopted a similar provision.... ***Any limousine that picks up or discharges passengers at either the MIA or the Seaport shall meet the MIA and Seaport limousine requirements.***

Miami–Dade County Code, § 31–602(b) (emphasis added). Plaintiff dismisses the highlighted text as a "throw in" because she believes that it negates the opening "nothing shall be construed to prohibit discharge" clause. Defendant argues that the phrase "lawfully transported into Miami–Dade County" encompasses application of OD–24, in addition to the highlighted text above. While the Court notes that there may be some inartfulness about the opening language in § 31–602(b), there is no need to read that language as conflicting with the application of OD–24; indeed, there is ample support within § 31–602(b) to indicate that Plaintiff must abide by OD–24.

*Commerce Clause*

■ To prevail on her interstate commerce claim, Plaintiff must demonstrate that her business constitutes a part of interstate commerce, and that OD–24 imposes an unreasonable burden on interstate commerce. *Executive Town & Country Svcs., Inc. v. City of Atlanta*, 789 F.2d 1523, 1525 (11th Cir.1986) (upholding minimum fare regulations imposed against limousines but not taxicabs as rationally related to City's goal of balancing trans-

---

10. While this discussion is found in the part of the *South Florida Taxicab Association* decision analyzing a substantive due process claim, the standard for evaluating due process challenges is "virtually identical" to the rational relationship test applicable to equal protection claims. *See South Florida Taxicab Assoc. v. Miami–Dade County*, 2004 WL 958073, *6 n. 4, 2004 U.S. Dist. LEXIS 6730, *21 n. 4 (S.D.Fla.2004), quoting *Wood v. United States*, 866 F.2d 1367, 1371 (11th Cir. 1989).

portation market). It is undisputed that Plaintiff's business involves trips to and from the airports located in the South Florida region, including MIA, and that the bulk of Plaintiff's customers are from out-of-state or are Florida residents traveling out-of-state. Defendant's Statement of Undisputed Material Facts, ¶ 6, citing to Plaintiff's Deposition at 30. At least one court has addressed the precise question of whether limousine service to/from airports constitutes interstate commerce and found that, at least based upon the evidence in that case, limousine services to and from airports are a part of interstate commerce. "[L]imousine service is distinguishable from the typical taxicab service ...[the] vast majority of [the limousine company's] business consists of prearranged trips to and from the ... airport." *Id.* at 1526 (11th Cir.1986). This Court finds that Plaintiff has established that her business operations are a part of interstate commerce.

Having decided that Plaintiff's business is involved in interstate commerce does not compel a conclusion that she has demonstrated a commerce clause violation. The commerce clause protects the interstate "market" itself, not specific companies. *Executive Town & Country,* 789 F.2d at 1526. To succeed with her claim, Plaintiff must demonstrate that OD–24 places an unreasonable burden on interstate commerce. This review is similar to the rational relationship review discussed above with respect to the equal protection challenge. For example, the question of whether a regulation is rationally related to a legitimate government purpose and whether it will advance that purpose involves some examination of the burden that is being imposed and the consequences to be faced by the regulated individual or business.

The court in *American V.I.P.* determined that the requirements of OD–24 were not clearly excessive at the time of that challenge in 1990–91, and this Court finds nothing to suggest that the passage of the intervening fifteen years changes the results of that analysis. "[T]he regulatory provisions in ... OD–24 are valid and reasonable and do not constitute an unreasonable burden on interstate commerce." 757 F.Supp. at 1397.

In this case, Dr. Mundy reports that the $2.50 per trip fee in OD–24 is "well within the range of fees charged by airports across the country." Declaration of Dr. Ray Mundy, ¶ 18, and that approximately one half of the 65 airports who reported charging similar fees (i.e., 81.25% of the 80 airports he surveyed in 2003) do base the fee on a per trip basis; of those approximately 33 airports, the per trip fees ranged from $.50 to $10, with an average of $2.45. Exhibit A, Declaration of Dr. Ray Mundy. Plaintiff offers only her own testimony to rebut this assertion, and claims that "to the best of my knowledge there's no pick-up or drop-off fee anywhere in the State of Florida [nor in 49 states] other than [MIA]." Plaintiff's Deposition, December 29, 2004, pp. 14, 74. Because Plaintiff's assertion specifically is conditioned by "to the best of my knowledge," the Court does not find that this constitutes a disputed fact; even if a dispute had been created on this issue, it would not prohibit the entry of summary judgment because the question of whether other airports impose a specific "per-trip" fee is not material to the Court's decision. In light of the all of the evidence presented, the Court has determined that the fees in OD–24 do not appear to be unreasonable when compared to those fees charged at other airports in North America.

The evidence offered by Plaintiff herself indicates that the burden presented by

OD–24 is not unreasonable with respect to her company's revenue. According to Plaintiff's deposition testimony, "[a]irport transportation is the backbone of every limousine company" and approximately 85% of Plaintiff's business involves trips to and from airports. Plaintiff's Deposition, at 12. Plaintiff estimates that 60% of her company's trips are to and from the Palm Beach County airport, and another 30–40% relate to the Fort Lauderdale (Broward County) airport. Plaintiff's Deposition, at 13. Plaintiff charges $140 per trip from WPB to MIA. Plaintiff's Deposition, at 104. The $2.50 charge corresponds to 1.7% of the fees Plaintiff collects. Plaintiff already carries the required amount of automobile liability insurance because her home County, Palm Beach County[11], requires her to do so. Defendant's Statement of Undisputed Material Facts, ¶ 4. Palm Beach County does not require Plaintiff to carry the $300,000 in general liability insurance, and she asserts that the cost of adding that insurance in order to comply with OD–24 is overly burdensome. "Anything that costs ... [more] than what I'm already paying for car insurance is prohibitive." Plaintiff's Deposition, at 45. Plaintiff offered no specific estimate of the cost of that additional insurance, nor did she demonstrate that its cost could not be absorbed by her company either through a reduction in profit margin or by increasing her charges to customers. As such, this

Court cannot find that Plaintiff's role in interstate commerce is unduly burdened.

■ Since the burden on interstate commerce imposed by OD–24 does not exceed the intended benefits of the regulation, as discussed previously, no violation of the commerce clause has been demonstrated. *Id.* at 1527.

As a final note, the Court is not persuaded by Plaintiff's statements that her use of MIA's facilities solely to drop off passengers, instead of picking them up, creates a material difference such that Plaintiff should be exempt from OD–24's requirements. Plaintiff admits that she is not licensed to pick up passengers at MIA, and has not demonstrated that her use of the airport's facilities to drop off a passenger is materially different from her use of those same facilities if she were to pick up a passenger.[12] Defendant's expert suggests that dropping off a passenger actually poses a greater strain on the airport's congested roadways because the limousine, a longer vehicle than the average taxicab, must navigate to the curbside amid the high volume of other traffic. Declaration of Dr. Ray Mundy, ¶ 26.

Having found no constitutional infirmity in OD–24, the Court now turns to Plaintiff's state law claims alleging malicious prosecution and abuse of process. The Court declines to exercise supplemental

11. Plaintiff has a license to operate her nine vehicles in Palm Beach County, and a reciprocal license to operate in Broward County (issued by the Broward Consumer Affairs Office for a one-time fee of $50 per vehicle and based on the existence of a valid license from a neighboring county). Plaintiff's Deposition, at 10.

12. The major difference between a limousine trip to drop off a passenger as compared to a trip to pick up a passenger is that the limousine picking up a passenger might be parked in a lot or designated space while the limousine driver goes inside the airport terminal to meet the arriving passenger. A limousine dropping off a passenger presumably does not need to park and may be using airport roadways for a shorter period of time but nevertheless has driven on the roadways and contributed to traffic congestion. In the final analysis, this difference in whether the limousine might park or not is insignificant to an assessment of whether OD–24's fees and insurance requirements actually advance a legitimate government purpose. *See* discussion in *American V.I.P.,* at 757 F.Supp. at 1393.

jurisdiction pursuant to 28 U.S.C. § 1367 over these two claims in light of the Court's conclusion that OD–24 is rationally related to a legitimate government purpose. Moreover, in light of the Court's ruling on the regulation, it is doubtful whether Plaintiff could prevail on either of her state claims in any event. And, as further grounds, Defendants had argued convincingly that Plaintiff failed to comply with the statutory notice requirements prior to filing this action. Fla. Stat. § 768.28.

For all of the above reasons, it is hereby

ORDERED AND ADJUDGED that the Defendant's motion for summary judgment be GRANTED. Entry of judgment will follow by separate order. Further, it is

ORDERED AND ADJUDGED that the Plaintiff's cross-motion for summary judgment be DENIED. And, finally, it is

ORDERED AND ADJUDGED that Plaintiff's state law claims, i.e., Counts IV and V, be DISMISSED. This case is CLOSED.